IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

SHAWN MORRIS,

    Plaintiff,

v.

WESCO AIRCRAFT, et al.,

    Defendants.

CIVIL ACTION
NO. 17-4576

**OPINION**

**Slomsky, J.**                                                                                                                                                                 November 20, 2018

## I.    INTRODUCTION

Plaintiff Shawn Morris ("Plaintiff"), a 54-year-old African-American female, brings this suit against her former employers, Defendant Wesco Aircraft and Defendant Haas Group (collectively, "Defendants"),[1] alleging age discrimination under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, et seq., and race discrimination, retaliation, and hostile work environment under 42 U.S.C. § 1981 and under Title VII of the Civil Rights Act of 1964, 32 U.S.C. § 2000(e), et seq. (Doc. No. 19.) Plaintiff claims that Defendants afforded her differential treatment because of her race and age. Plaintiff also claims that Defendants subjected her to a hostile work environment and retaliated against her because of her race and complaints of race discrimination.

---

[1] In the Second Amended Complaint, Plaintiff alleges that Defendants Wesco Aircraft and Haas Group were sufficiently interrelated during her period of employment to constitute her joint employer. (Doc. No. 19 ¶ 12.) Plaintiff further alleges that Wesco Aircraft purchased Haas Group in approximately 2014. (Id. ¶ 10.) Since neither Defendant disputes this characterization, Plaintiff's claims against her "employer" will be considered claims asserted against both Wesco Aircraft and Haas Group.

1

More specifically, in Count I of the Second Amended Complaint, Plaintiff alleges violations of the ADEA. She claims that Defendants terminated her because of her "advanced age" and replaced her with an individual ten years her junior. (Id. ¶¶ 33-36.) In Counts II and III, Plaintiff asserts violations of 42 U.S.C. § 1981 and Title VII, respectively. In each Count, Plaintiff brings claims against Defendants for race discrimination, hostile work environment, and retaliation. (Id. at 9-10.) Plaintiff claims that she has suffered loss of earnings, salary, pay increases, bonuses, medical benefits, training, promotions, pension, and seniority because of Defendants' discrimination. (Id. at 10-11.)

On April 9, 2018, Defendants filed a Motion to Partially Dismiss Plaintiff's Second Amended Civil Action Complaint. (Doc. No. 24.) In the Motion, Defendants assert that Plaintiff has failed to state a claim under Counts II and III for race discrimination, hostile work environment, and retaliation. (Id.) On April 23, 2018, Plaintiff filed a Response in Opposition (Doc. No. 25). On April 30, 2018, Defendants filed a Reply. (Doc. No. 26.) Defendants' Motion is now ripe for disposition. For the following reasons, the Court will deny Defendants' Motion.

## II. BACKGROUND[2]

Plaintiff, a 54-year-old African-American woman, worked for Defendants as a buyer for approximately a year and a half until May 2017. (Doc. No. 19 ¶¶ 15-16, 27.) At all times throughout her employment, Plaintiff was the only permanent African-American employee in her department. (Id. ¶ 18.) Plaintiff was supervised by two Caucasian female employees, Eileen Murray ("Murray") and Carol Tonelli ("Tonelli"). (Id. ¶ 19.)

---

[2] The facts are taken from the Second Amended Complaint and are accepted as true for purposes of deciding the Motion to Dismiss.

While employed with Defendants, Plaintiff submits that she was treated in a "discriminatory and hostile manner because of her race and age." (Id. ¶ 20.) According to the Second Amended Complaint, Murray and Tonelli consistently gave Plaintiff less time and stricter deadlines to complete a heavier workload than her younger white co-workers in the same position. (Id. ¶ 20(a).) Plaintiff alleges that Murray and Tonelli would reprimand and discipline her for missing deadlines, but not discipline her two white co-workers, Desiree and Donna, for the same conduct. (Id.)

Plaintiff further alleges that as compared to her white co-workers, she was expected to complete more orders, denied training on order processing, and ignored at staff meetings by Tonelli and Murray when she attempted to offer comments and/or ask questions. (Id. ¶ 20(b)-(d).) Plaintiff also alleges that Tonelli and Murray consistently yelled at and spoke to her in a demeaning manner. (Id. ¶ 20(e).) Plaintiff recalls Murray and Tonelli telling her that she "could not understand anything," "was not good enough," and "could not follow clear instructions." (Id.) When Plaintiff attempted to follow up on the criticism, Murray and Tonelli would refuse to expand or explain. (Id.)

Plaintiff also alleges that Tonelli and Murray disciplined her for vague reasons like "being loud" and having "negative body language," but did not similarly discipline her white co-workers. (Id. ¶ 20(f).) Plaintiff gives the example of once being written up by Tonelli for singing at work, even though her white co-worker, Kathy O'Brien, with whom she was singing at the time, received no write-up or reprimand. (Id. ¶ (g).) Aside from discipline, Plaintiff alleges that Tonelli frequently made explicit inappropriate comments to her about her race. (Id. ¶ 21.) As an example, Tonelli once said to her, "don't worry, I have a black half-sister." (Id.)

3

Moreover, Plaintiff asserts that she witnessed some of her co-workers discriminate against other individuals of minority groups in the presence of Defendants' management, including Tonelli. (Id. ¶ 22.) For example, Plaintiff claims she witnessed her white co-worker, Trevor Harmon, make disparaging remarks to her Asian co-worker, Andrew Park, about the "wide angled" shape of his eyes and comment on his ability to see. (Id.) Plaintiff alleges she witnessed co-workers make jokes about a Middle Eastern employee being a terrorist. (Id.)

On or about March 24, 2017, Plaintiff made a written complaint of discrimination to Defendants' Human Resources Business Partner, Yvette Villages ("Villages"). (Id. ¶ 24.) In the complaint, Plaintiff informed Villages that management, including Tonelli, had been condoning discriminatory and racist behavior in the workplace. (Id.) As an example, Plaintiff informed Villages of the comments Trevor Harmon had been making to Andrew Park. (Id.) According to Plaintiff, Villages responded "with a significant degree of hostility and questioned the validity of [her] complaint." (Id. ¶ 25.) Plaintiff believes and avers that Defendants never properly investigated her complaint and that the only action Villages took upon receipt of her complaint was to inform Tonelli and Murray of her allegations. (Id. ¶¶ 25-26.)

On May 9, 2017, approximately six weeks after Plaintiff complained of discrimination to Villages, she was called into a meeting with Tonelli, Murray, Villages (by telephone), and Jeff Perdick, and terminated from her employment with Defendants. (Id. ¶ 27.) At that time, Defendants did not provide Plaintiff with a reason for her termination, but management later informed her that she was being terminated for "very ambiguous reasons, including her 'attitude.'" (Id. ¶ 30.) Following her termination, Plaintiff alleges Defendants replaced her with an individual ten (10) years her junior. (Id. ¶ 31.)

On March 19, 2018, Plaintiff filed a Second Amended Complaint ("Second Amended Complaint" or "SAC") against Defendants, asserting claims for age discrimination under the ADEA (Count I), race discrimination, hostile work environment, and retaliation under § 1981 (Count II), and race discrimination, hostile work environment, and retaliation under Title VII (Count III). (Doc. No. 19.) On April 9, 2018, Defendants moved to partially dismiss the SAC for failure to state a claim under Counts II and III. (Doc. No. 24.)

### III. STANDARD OF REVIEW

The motion to dismiss standard under Federal Rule of Civil Procedure 12(b)(6) is set forth in Ashcroft v. Iqbal, 556 U.S. 662 (2009). After Iqbal, it is clear that "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to defeat a Rule 12(b)(6) motion to dismiss. Id. at 678; see also Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007). "To survive dismissal, 'a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" Tatis v. Allied Interstate, LLC, 882 F.3d 422, 426 (3d Cir. 2018) (quoting Iqbal, 556 U.S. at 678). Facial plausibility is "more than a sheer possibility that a defendant has acted unlawfully." Id. (quoting Iqbal, 556 U.S. at 678). Instead, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (quoting Iqbal, 556 U.S. at 678).

Applying the principles of Iqbal and Twombly, the Third Circuit in Santiago v. Warminster Township, 629 F.3d 121 (3d Cir. 2010), set forth a three-part analysis that a district court in this Circuit must conduct in evaluating whether allegations in a complaint survive a Rule 12(b)(6) motion to dismiss:

> First, the court must "tak[e] note of the elements a plaintiff must plead to state a claim." Second, the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." Finally,

5

"where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief."

Id. at 130 (quoting Iqbal, 556 U.S. at 675, 679). The inquiry is normally broken into three parts: "(1) identifying the elements of the claim, (2) reviewing the complaint to strike conclusory allegations, and then (3) looking at the well-pleaded components of the complaint and evaluating whether all of the elements identified in part one of the inquiry are sufficiently alleged." Malleus v. George, 641 F.3d 560, 563 (3d Cir. 2011).

A complaint must do more than allege a plaintiff's entitlement to relief, it must "show" such an entitlement with its facts. Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (3d Cir. 2009) (citing Phillips v. County of Allegheny, 515 F.3d 224, 234-35 (3d Cir. 2008)). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" Iqbal, 556 U.S. at 679 (alteration in original) (citation omitted). The "plausibility" determination is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id.

IV. **ANALYSIS**

In the present action, Defendants advance three arguments in support of their Partial Motion to Dismiss. Specifically, Defendants argue that under both § 1981 and Title VII: (1) Plaintiff failed to plead severe or pervasive discrimination to maintain a hostile work environment claim; (2) Plaintiff failed to plead a prima facie case of disparate treatment based on race; and (3) Plaintiff failed to plead a prima facie case of retaliation. (Doc. No. 24.)

After reviewing the facts as set forth above, the Court is not persuaded by Defendants' arguments and instead finds that Plaintiff has met her burden at this stage of the proceedings.

6

Thus, for the reasons discussed below, the Court will deny Defendants' Partial Motion to Dismiss.

### A. Plaintiff Has Pled Facts Sufficient to State a Plausible Claim of Hostile Work Environment Under § 1981 and Title VII

Defendants first argue that Plaintiff has not stated a claim for hostile work environment because she has not alleged discrimination severe or pervasive enough to constitute "an abusive working environment or a workplace permeated with discrimination." (Doc. No. 24 at 6.) The Court disagrees. To succeed on a hostile work environment claim under § 1981 and Title VII, a plaintiff must show that "'1) the employee suffered intentional discrimination because of his/her [race], 2) the discrimination was severe or pervasive, 3) the discrimination detrimentally affected the plaintiff, 4) the discrimination would detrimentally affect a reasonable person in like circumstances, and 5) the existence of respondeat superior liability [meaning the employer is responsible].'" Castleberry v. STI Grp., 863 F.3d 259, 263 (3d Cir. 2017) (quoting Mandel v. M & Q Packaging Corp., 706 F.3d 157, 167 (3d Cir. 2013)); See White v. City of Phila., No. 11–4197, 2012 WL 28074, at *4 (E.D. Pa. Jan.5, 2012) ("§ 1981 claim for hostile work environment must satisfy the same elements as a hostile work environment claim under Title VII of the Civil Rights Act of 1964.").

To prove the second element of hostile work environment, a plaintiff must show "discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment." Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 116, 122 S.Ct. 2061 (2002) (internal quotation marks omitted). A court must consider the totality of the circumstances in evaluating severity and pervasiveness, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work

performance." Harris v. Forklift Sys., Inc., 510 U.S. 17, 23, 114 S.Ct. 367 (1993). Moreover, "severity and pervasiveness are alternative possibilities: some harassment may be severe enough to contaminate an environment even if not pervasive; other, less objectionable, conduct will contaminate the workplace only if it is pervasive." Castleberry, 863 F.3d at 264 (citing Jensen v. Potter, 435 F.3d 444, 449 n.3 (3d Cir. 2006)).

In the present action, Plaintiff has alleged sufficiently severe or pervasive discrimination to plausibly state a claim for hostile work environment. Plaintiff alleges in the Second Amended Complaint that she was treated in a discriminatory and hostile manner due to her race insofar as she was "yelled at, belittled, treated in a rude condescending manner, given pretextual discipline, given heavier work assignments, and had policies selectively enforced against her by Defendants' management." (Doc. No. 19 ¶ 20.) Plaintiff also alleges in the Second Amended Complaint several specific instances of the discriminatory treatment she was allegedly subjected to by Defendants. (Id.)

With respect to discipline, for example, Plaintiff recounts that she was scolded and reprimanded by Murray and Tonelli for failing to meet deadlines, but that her white co-workers, Donna and Desiree, were not disciplined for the same issue. (Id.) Plaintiff also alleges that Tonelli wrote her up for singing at work and "being disruptive," but did not write up the white co-worker with whom she was singing at the time, Kathy O'Brien. (Id.) As to Plaintiff's allegation that she was "yelled at," she asserts that Murray and Tonelli made comments to her that she "could not understand anything" and "was not good enough," but refused to give her any kind of explanation for the criticism. (Id.)

Despite the allegations of discrimination Plaintiff has described in the Second Amended Complaint, Defendants maintain that the allegations fall short of establishing a "workplace

performance." Harris v. Forklift Sys., Inc., 510 U.S. 17, 23, 114 S.Ct. 367 (1993). Moreover, "severity and pervasiveness are alternative possibilities: some harassment may be severe enough to contaminate an environment even if not pervasive; other, less objectionable, conduct will contaminate the workplace only if it is pervasive." Castleberry, 863 F.3d at 264 (citing Jensen v. Potter, 435 F.3d 444, 449 n.3 (3d Cir. 2006)).

In the present action, Plaintiff has alleged sufficiently severe or pervasive discrimination to plausibly state a claim for hostile work environment. Plaintiff alleges in the Second Amended Complaint that she was treated in a discriminatory and hostile manner due to her race insofar as she was "yelled at, belittled, treated in a rude condescending manner, given pretextual discipline, given heavier work assignments, and had policies selectively enforced against her by Defendants' management." (Doc. No. 19 ¶ 20.) Plaintiff also alleges in the Second Amended Complaint several specific instances of the discriminatory treatment she was allegedly subjected to by Defendants. (Id.)

With respect to discipline, for example, Plaintiff recounts that she was scolded and reprimanded by Murray and Tonelli for failing to meet deadlines, but that her white co-workers, Donna and Desiree, were not disciplined for the same issue. (Id.) Plaintiff also alleges that Tonelli wrote her up for singing at work and "being disruptive," but did not write up the white co-worker with whom she was singing at the time, Kathy O'Brien. (Id.) As to Plaintiff's allegation that she was "yelled at," she asserts that Murray and Tonelli made comments to her that she "could not understand anything" and "was not good enough," but refused to give her any kind of explanation for the criticism. (Id.)

Despite the allegations of discrimination Plaintiff has described in the Second Amended Complaint, Defendants maintain that the allegations fall short of establishing a "workplace

permeated with discrimination." (Doc. No. 24 at 6.) In support of this argument, Defendants rely on <u>Oberdorf v. Penn Village Facility Operations, LLC</u>, No. 15-1880, 2016 WL 1752732 (M.D. Pa. May 3, 2016). In <u>Oberdorf</u>, a sex discrimination case, the district court dismissed plaintiff's hostile work environment claim in part because plaintiff failed to plead facts to support pervasive discrimination. <u>Id.</u> at *4-5. The district court noted as follows:

> Mr. Oberdorf also pled that [his supervisor] April made "multiple derogatory comments" and provided an example of one of her statements. He failed to plead, however, if the multiple comments were made on separate or on one occasion and did not provide any dates or even a range of dates, other than to say that he began experiencing discrimination "[w]hile under the supervision of April."

Unlike the complaint in <u>Oberdorf</u>, however, Plaintiff alleges in the Second Amended Complaint far more than "multiple derogatory comments." (Doc. No. 19.) Not only does Plaintiff submit that Tonelli made discriminatory comments to her like "don't worry, I have a black half-sister," she also alleges several specific instances of her being yelled at, belittled, and treated discriminatorily by Defendants. (<u>Id.</u> ¶ 20.) In contrast to the facts in <u>Oberdorf</u>, the allegations in the Second Amended Complaint suffice to show severe or pervasive discrimination at this stage of the proceedings. (<u>Compare</u> Doc. No. 19 <u>with</u> Doc. No. 24-4.) Accordingly, Plaintiff's hostile work environment claim will not be dismissed.

### B. Plaintiff Has Pled Facts Sufficient to State a Plausible Claim of Disparate Treatment Race Discrimination Under § 1981 and Title VII

Defendants next argue that Plaintiff failed to establish a prima facie case of disparate treatment on the basis of race under § 1981 and Title VII. (Doc. No. 24 at 10.) When, as here, there is no direct evidence of discrimination, a court analyzes § 1981 and Title VII disparate treatment claims under the burden-shifting framework set forth in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802 (1973). <u>Parker v. Verizon Pa. Inc.</u>, 309 Fed. App'x. 551, 555 (3d Cir. 2009); <u>Jones v. School Dist. of Phila.</u>, 198 F.3d 403, 410 (3d Cir. 1999) (Title VII and § 1981

9

disparate treatment race discrimination claims are both analyzed pursuant to McDonnell Douglas).

Under the McDonnell Douglas framework, the plaintiff must first establish a prima facie case of discrimination by showing that (1) she is a member of a protected class; (2) she was qualified for the position she sought to attain or retain; (3) she suffered an adverse employment action; and (4) the action occurred under circumstances that could give rise to an inference of intentional discrimination. Sarullo v. U.S. Postal Serv., 352 F.3d 789, 797 (3d Cir. 2003). If a plaintiff has established a prima facie case, the burden of production shifts to the defendant to articulate some legitimate nondiscriminatory reason for the challenged employment action. Burton v. Teleflex Inc., 707 F.3d 417, 427 (3d Cir. 2013). If the defendant meets this burden, the plaintiff ultimately must prove by a preponderance of the evidence that the legitimate reason offered by the defendant is merely pretext for discrimination. Id. (citing Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994)).

A prima facie case is "an evidentiary standard, not a pleading requirement." Connelly v. Lane Const. Corp., 809 F.3d 780, 789 (3d Cir. 2016) (quoting Swierkiewicz v. Sorema, N.A., 534 U.S. 506, 510 (2002)). As such, the post-Twombly pleading standard "'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of' the necessary element[s]." Phillips v. Cty. of Allegheny, 515 F.3d 224, 234 (3d Cir. 2008) (quoting Twombly, 550 U.S. at 556.)

The first three elements of Plaintiff's prima facie case are not in dispute. She is an African-American individual, she was qualified to work as a buyer, and she suffered an adverse employment action when she was terminated from her employment with Defendants. As to the

fourth element, Plaintiff has pled sufficient facts to infer that race motivated Defendants' decision to terminate her employment.

Here, regarding the fourth element, Plaintiff alleges several examples of ways in which Defendants, and specifically Tonelli and Murray, treated her differently than her white co-workers. (Doc. No. 19 ¶ 20.) Plaintiff submits, for example, that she was subjected to strict deadlines and disciplined when she failed to meet such deadlines, but that her white co-workers, including Donna and Desiree, were not similarly disciplined. (Id.) Plaintiff claims that Donna, a white Buyer who worked under Plaintiff's same management, was not disciplined, but rather accommodated when she failed to meet deadlines by being given a reduced workload. (Id.)

Plaintiff further alleges that unlike her "younger white co-workers in the same position," she was nit-picked, yelled at, and belittled for things such as "being loud" and having "negative body language." (Id.) Beyond discriminatory treatment and discipline, Plaintiff claims that Tonelli often made inappropriate discriminatory comments to her and cites the example of Tonelli stating to her "don't worry, I have a black half-sister." (Id. ¶ 21.) Taken together, these allegations suffice to raise an inference of intentional discrimination.

Moreover, Plaintiff's allegations raise a plausible inference that Defendants' decision to terminate her employment was connected to her race. As noted, Plaintiff has alleged several ways in which Tonelli and Murray treated her less favorably than her white co-workers. (Id. ¶¶ 20-21.) Plaintiff also submits that she was terminated from her employment in a meeting that included Tonelli and Murray. (Id. ¶ 27.) Further, Plaintiff claims that at the time of the meeting, Tonelli and Murray refused to provide her with any reason for her termination. (Id. ¶¶ 29-30.) Given the roles Tonelli and Murray allegedly played in discriminating against Plaintiff, and their

involvement with Plaintiff's termination, the Second Amended Complaint plausibly establishes an inference of intentional discrimination.

Defendants nevertheless contend that Plaintiff's allegations of discriminatory treatment fall short of the post-<u>Twombly</u> pleading standard. (Doc. No. 24 at 11.) In support of their contention, Defendants rely on <u>Chernobai v. Hydraulax Prods., Inc.</u>, No. 14-6938, 2015 WL 710464 (E.D. Pa. Feb. 19, 2015), in which the court dismissed a plaintiff's national origin discrimination claim. Defendants argue that Plaintiff's allegations of race discrimination in this case are strikingly similar to the allegations deemed insufficient in <u>Chernobai</u>. (Doc. No. 24 at 11.)

In <u>Chernobai</u>, the plaintiff alleged that defendant had unlawfully discriminated against him on the basis of his national origin, Ukranian. <u>Id.</u> at *1. The plaintiff alleged he was called names such as "stupid Russian." <u>Id.</u> at *3. The plaintiff also alleged that he was subjected to disparate treatment because other employees could speak non-English languages while at work and were assigned more substantive tasks. <u>Id.</u> The court held that plaintiff's allegations of discriminatory comments did not create an inference of discrimination because the complaint failed to identify the person who called him a "stupid Russian" or "provide any facts showing that this comment was in any way connected to his termination." <u>Id.</u> The court similarly rejected the plaintiff's allegations of disparate treatment, noting as follows:

> Chernobai does not identify the individual(s) who treated him less favorably or any individual(s) who had a role in his termination. He alleges no facts establishing a connection between this treatment and his termination. Without some connection between the alleged disparate treatment and Chernobai's termination, he has not pled facts sufficient to raise a reasonable inference of discrimination.

<u>Id.</u> at *3-4.

Here, the allegations of the Second Amended Complaint go well beyond the allegations that were made in Chernobai. (Compare Doc. No. 19 with Doc. No. 24-3.) Unlike in Chernobai, Plaintiff has specifically identified Tonelli as the person who made discriminatory comments to her, asserting with an example that Tonelli made frequent "inappropriate remarks about Plaintiff's race in the workplace." (Doc. No. 19 ¶ 21.) Moreover, with respect to Plaintiff's alleged disparate treatment, she has listed several examples of how she was treated less favorably than white buyers who worked under the same management. (Id. ¶ 20.) Plaintiff has also asserted a connection between her alleged discriminatory treatment and termination because she submits that Tonelli and Murray played a significant role in both. (Id. ¶¶ 20-21, 27-29.) For these reasons, the Complaint plausibly raises an inference of intentional discrimination and, as such, Plaintiff has established a prima facie case of disparate treatment at this stage.

### C. Plaintiff Has Pled Facts Sufficient to State a Plausible Claim of Retaliation Under § 1981 and Title VII

Defendants also contend that Plaintiff failed to state a claim of retaliation based on race under § 1981 and Title VII because "she has not pled a causal connection" required to establish a prima facie case. (Doc. No. 24 at 13.) Like disparate treatment, § 1981 and Title VII retaliation claims are analyzed under the McDonnell Douglas burden-shifting framework. Carvalho-Grevious v. Delaware State Univ., 851 F.3d 249, 256-57 (3d Cir. 2017). To state a prima facie case of retaliation, a plaintiff must show that (1) she engaged in protected activity; (2) the employer took an adverse employment action against her; and (3) there was a causal connection between the protected activity and the adverse employment action. Moore v. City of Philadelphia, 461 F.3d 331, 340-41 (3d Cir. 2006).

The first two elements of Plaintiff's prima facie case are not in dispute. (Doc. No. 24 at 13.) With respect to the first element, Plaintiff engaged in protected activity by submitting a

written complaint of discrimination to Defendants' HR Business Partner, Yvette Villages. (Doc. No. 19 ¶ 24.) With respect to the second element, Plaintiff suffered an adverse employment action when she was terminated from her employment with Defendants on May 9, 2017. (Id. ¶ 27.) Defendants argue that Plaintiff has not established the third element of her prima facie case of retaliation because "she has not pled facts linking her complaint to Human Resources to her subsequent termination." (Doc. No. 24 at 13.) Again, the Court disagrees.

To show a causal link between a plaintiff's protected activity and adverse employment action, "a plaintiff may rely on a 'broad array of evidence.'" Marra v. Phila. Housing Auth., 497 F.3d 286, 302 (3d Cir. 2007) (citing Farrell v. Planters Lifesavers Co., 206 F.3d 271, 284 (3d Cir. 2000)). "In certain narrow circumstances, an 'unusually suggestive' proximity in time between the protected activity and the adverse action may be sufficient, on its own, to establish the requisite causal connection." Id. (citing Robinson v. City of Pittsburgh, 120 F.3d 1286, 1302 (3d Cir. 1997) (finding a causal connection where plaintiff was discharged just two days after making a complaint with the EEOC)). See Blakney v. City of Phila., 559 Fed. App'x 183, 186 (3d Cir. 2014) ("a temporal proximity greater than ten days requires supplementary evidence of retaliatory motive"). Absent "unusually suggestive" timing, courts will consider "the circumstances as a whole, including any intervening antagonism by the employer" to determine whether the plaintiff has established a causal link. Daniels v. School Dist. of Phila., 776 F.3d 181, 196 (3d Cir. 2015).

Here, the six weeks that lapsed between Plaintiff's complaint to Villages and her termination from employment is not so unusually suggestive to establish a causal connection. The temporal proximity coupled with Plaintiff's circumstantial evidence of Defendants' antagonism towards her after she complained to Villages, however, is enough to prove the

requisite causal link at this stage. Plaintiff alleges that after she complained to Villages, Villages responded with "a significant degree of hostility and questioned the validity of [her] complaint." (Doc. No. 19 ¶ 25.) Plaintiff specifically avers that Villages told her she did not understand why she was making the complaint, despite Plaintiff telling Villages that Murray and Tonelli were condoning the use of racial slurs in the workplace. (Id. ¶¶ 24-25.)

Moreover, Plaintiff alleges that Villages never followed up with her about her complaint and Defendants never properly investigated or attempted to resolve Plaintiff's concerns. (Id. ¶ 25.) Plaintiff further avers that Villages told Murray and Tonelli of her complaints, making them aware that Plaintiff had accused them of discriminatory/racist behavior prior to the termination meeting on May 9, 2017. (Id. ¶ 26.)

Taken as true, Defendants' actions after Plaintiff complained to Villages of discrimination, along with the relatively short period of time that elapsed between Plaintiff's complaint and termination from employment, is sufficient evidence of a causal connection between Plaintiff's protected activity and adverse employment action. As such, the Court is persuaded that Plaintiff has met her burden of pleading a plausible retaliation claim under § 1981 and Title VII to survive Defendants' Motion to Dismiss.

## V. CONCLUSION

For the foregoing reasons, Defendants' Motion to Partially Dismiss Plaintiff's Second Amended Civil Action Complaint (Doc. No. 24) will be denied. An appropriate Order follows.